## MURPHY v. CITY OF ASBURY PARK et al.

### No. 8378.

Circuit Court of Appeals, Third Circuit.

Argued Oct. 22, 1943.

Decided Jan. 14, 1944.

---

Ward Kremer, of Asbury Park, N. J. (Joseph F. Mattice, of Asbury Park, N. J., on the brief), for appellant.

Theodore D. Parsons, of Red Bank, N. J. (Parsons, Labrecque & Borden, of Red Bank, N. J., on the brief), for appellee.

Before JONES, GOODRICH, and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge.

This is a personal injury case. The plaintiff was a passenger in an automobile, owned by John J. Bennett and operated by Peter A. Bennett, which collided with one of a series of structures erected on Ocean Avenue, Asbury Park, New Jersey, by that municipality. The accident happened about 6:00 P.M., January 20, 1940, on Ocean Avenue at its intersection with Sixth Avenue in that city. Ocean Avenue runs north and south. It is the most easterly thoroughfare of Asbury Park and is next to and parallels the ocean front. It is 54 feet, seven inches wide. It is a main highway, carrying much of the Asbury Park vehicular traffic and is crossed by pedestrians going to and from the beach. At the time of the accident, there was in existence, a set of standards at intervals along the center of Ocean Avenue for substantially its length, or at least for a number of blocks. The standards had bell-shaped concrete bases. The bottom diameter of such base was 4 feet, its height was 3½ feet. From the top of the base, a vertical metal column extended about 10 feet further into the air. At the top of the column there was an electric light fixture. In addition, some of the poles had traffic lights attached to them. The particular standard identified with the collision, did not. It did, however, have an inlaid sign on its base reading "Sixth Avenue," which was the east-west street opposite and deadending into Ocean Avenue. The particular base had painted on it the words "No center parking."

The Bennett automobile had been proceeding north on Ocean Avenue and to avoid hitting a car, Peter Bennett turned out to his left and struck the standard. In the District Court, there was a judgment in favor of the plaintiff and against the driver, Peter Bennett, and the City of Asbury Park. This appeal is taken by the City of Asbury Park. The defendant, Peter Bennett, did not take any appeal.

It is evident that the standard was a part of Asbury Park's lighting and traffic system on Ocean Avenue. The municipality itself installed and maintained that system, including the particular stanchion in question. The fundamental question in the case is whether it was authorized by law. If it was, then, as Judge Biggs, speaking for this Court, said in Delaware, Lackawanna & Western Railroad Company v. Chiara, 3 Cir., 95 F.2d 663, at page 664: "* * * members of the public, including the appellees, are required to take notice of its presence and situation, and the learned trial judge should have directed a verdict for the appellant as prayed for by it."

It is not clear from the testimony just when the standards were erected. The only one of plaintiff's witnesses who ventured to hazard a date, fixed the time as about 1927. Plaintiff's attorney, in response to the Court's questions, said that from the best proof they had, the standard had been erected approximately fifteen years prior to the trial date which was May 1942 and which would make the construction date approximately 1927. The date of construction is not mentioned in the trial court's charge. However, in the opinion on the motion to set aside the verdict, the court, from language in one of the Asbury Park ordinances in evidence inferred that the standards were erected in 1921. In any event, 1921 is the earliest possible date.

In 1917, the New Jersey Legislature passed what is popularly called the "Home Rule Act" (P.L. 1917, Chapter 152, pages 319, 410, N.J.S.A. 40:42–1 et seq.). Paragraph 1, Article XXIV of that Act reads as follows: "1. The governing body of every municipality shall have power by ordinance to cause the streets and public places of such municipality to be lighted, to acquire all necessary lands and real estate for that purpose by purchase, gift or condemnation, and to erect thereon all necessary buildings and to equip the same with all necessary machinery and equipment, and to erect and maintain on or under said streets and public places all necessary poles, conduits, wires, fixtures and equipment, and to operate such lighting system at public expense." N.J.S.A. 40:67–13.

That law as it reads was in effect in 1921. It will be noted that a municipality was directed to proceed by ordinance. In 1921, Asbury Park enacted its ordinance No. 335 which ordained "that the necessary drains and sewers for standard lamps necessary in connection with the improvements to Ocean Avenue be installed and completed, and that the paving of Ocean Avenue Boulevard be completed * * *". In the same ordinance, the cost "for the extension and completion of the sewers and drains and bases for lamp standards in Ocean Avenue and for the completion of the paving of said Ocean Avenue" was estimated at $52,000.

In 1927 Asbury Park passed Ordinance No. 454 which referred to the previous Ordinance No. 335, saying that the work called for by the latter had been completed and authorizing a bond issue to pay for same.

In Paragraph 5(a) of Ordinance No. 454 appeared the following sentence in parenthesis: "(The original average periods of usefulness of said improvements being twenty years, six years of the period of said usefulness having already expired and leaving remaining fourteen years.)" This referred to all of the improvements mentioned in the ordinance, including "the necessary drains and sewers for standard lamps necessary in connection with the improvements to Ocean Avenue." It is from the above that the trial court assumed that the standard, with which we are concerned, was erected in 1921.

In 1923 a supplement to the 1917 Home Rule Act was enacted, P.L. 1923, Chapter 92, page 178, N.J.S.A. 40:67–16. That reads: "1. The governing body of every municipality shall have the power to establish safety zones, to erect, construct and maintain platforms, commonly called 'safety isles'; to erect, construct, maintain and operate standards, commonly called 'silent policemen,' beacon lights, guide posts or other structures, which in its judgment may be necessary for the safety and convenience of persons and vehicles using the streets in said municipality."

As is seen, the 1923 statute contained no restrictions on municipalities as to the necessity of proceeding by ordinance. This statute was more concerned with traffic regulation and control than with lighting, which latter had been the primary purpose of the 1917 Act.

A photograph of the stanchion, one of the exhibits in the case, was before this court on the argument of this appeal. It gives a general idea of the Ocean Avenue light and traffic setup. From it, and the other facts in the case, it is clear that the particular stanchion is authorized under both the 1917 and the 1923 statutes. It is in reality an ornamental pole or fixture set in a wide base and serving the double purpose of street lighting and traffic assistance. The appellant argues at length that the structure was not specifically authorized by either law. It is true that the Legislature did not in either Act, see fit to detail exact dimensions of "light poles" or of "standards, commonly called silent policemen, beacon lights, guide posts or other structures, which in its (the municipality) judgment may be necessary for the safety and convenience of persons and vehicles using the streets in said municipality." However, having in mind that both Acts were general laws, applying to every municipality in New Jersey and to an endless variety of local conditions, it is difficult to conceive how either law could be more specific and at the same time enable the municipalities of the State to function for practical purposes under them, in the respects indicated. As was said in Denzer v. D., L. & W. R. Co., 103 N.J.L. 95, 134 A. 820, at page 821, by the New Jersey Court of Errors and Appeals: "* * * the inquiry must be whether the particular structure is authorized by law; and whether a structure in one place differs from one in another is beside the mark."

Though it is extremely doubtful from the evidence, assuming that the stan-

dards were constructed in 1921, we think that the 1923 statute is applicable. That law, in addition to giving the municipalities the power to erect standards, etc., in the same sequence specifically authorizes them to maintain and operate such standards, etc. The language fairly embraces municipal structures of the type designated as were in existence at the time the 1923 Act came into being and authorizes their maintenance and operation. The Legislature in its effort to assist municipalities with their then increasing traffic problems never intended to create chaos. It certainly did not intend forcing the municipalities of the entire State to make the stupid, costly gestures of tearing down existing traffic structures and immediately thereafter erecting similar ones guided entirely by their judgment as to what was necessary for the safety and convenience of persons and vehicles using the streets of the municipalities. That such retrospective law is valid seems well settled. Professor Dillon in his work on Municipal Corporations, 4th Edition 2, page 780 says: "By virtue of its authority over public ways, the legislature may authorize acts to be done in and upon them or legalize obstructions therein which would be otherwise deemed nuisances."

In Calder v. Bull, 3 Dall. 386, at page 391, 1 L.Ed. 648, Justice Chase said:

"Every law that is to have an operation before the making thereof, as to commence at an antecedent time; * * * is retrospective. But such laws may be proper or necessary, as the case may be. * * *

"There are cases in which laws may justly, and for the benefit of the community, and also of individuals, relate to a time antecedent to their commencement."

■ The issue here is controlled by New Jersey law and the statutes and decisions of that State have been carefully examined in this light. It is settled in New Jersey that there can be no recovery as the result of a collision with a legalized permanent obstruction on a highway. In Lorentz v. P. S. R. Co., 103 N.J.L. 104, 134 A. 818, 49 A.L.R. 989, which is a New Jersey Court of Errors and Appeals case, an automobile collided with an elevated structure maintained by the defendant utility company on Central Avenue, Jersey City, New Jersey. It was shown that the structure was authorized by a New Jersey statute which contained a general authority to erect structures of that type. There was also an ordinance of Jersey City permitting its construction. The Court said at page 818 of 134 A.: "From what has been said it should be sufficiently obvious that the structure in question was a lawful one, sanctioned by legislative and municipal authority. It is elementary, of course, that any unlawful obstruction of the highway is prima facie a nuisance, and that the party responsible for it is liable in damages to the one injured thereby. This was the theory of the leading case of Durant v. Palmer, 29 N.J. L. 544. But it is equally well settled that the Legislature may legalize what would otherwise be a nuisance."

The Chiara case, supra, also involved a personal injury claim arising out of a New Jersey accident and decided under New Jersey law. There, an automobile collided with the base of a support of defendant's railroad bridge crossing Henderson Street, Jersey City. This Court said on page 664 of 95 F.2d: "The sole question presented for our consideration is whether or not the structure in question was a lawful one, sanctioned by legislative and municipal authority. Under the law of New Jersey, as construed by the Court of Errors and Appeals, any unlawful obstruction of a highway is prima facie a nuisance and the party responsible for it is liable in damages to one injured thereby. It is equally well settled that the Legislature may legalize what otherwise might be a nuisance." Citing the Lorentz case and a number of other New Jersey decisions.

■ In this view of the case, since the standard was authorized by law, it follows that the question of alleged active negligence on the part of the municipality does not arise. The trial court should have directed a verdict for the appellant as prayed for by it.

The judgment of the District Court is reversed.